**In re Melissa MATA.**

No. 03–06–00374–CV.

Court of Appeals of Texas,
Austin.

Aug. 9, 2006.

Rehearing Overruled Aug. 18, 2006.

Leigh Ann Fouts, Lubbock, for Relator.

Isaac M. Castro, Hamlin, Mark Marshall, Brady, for Real Party In Interest.

Before Chief Justice LAW, Justices B.A. SMITH and PURYEAR.

## OPINION

DAVID PURYEAR, Justice.

This case presents a cautionary tale illustrating the dangers of private, informal adoptions in which the legal procedures set out in the family code are not followed, leaving both natural parents and would-be adoptive parents open to possible heartache. A private adoption such as this one, while a joyous possibility, can be fraught with risks for everyone involved. The birth mother is faced with the need to make the most difficult of decisions—to forever surrender her parental rights and allow another family to adopt and raise her child—and it is important that her decision to relinquish her parental rights not be rushed. She must have time to fully consider such a momentous decision and the opportunity to seek legal counsel and counsel from family or friends to help her fully understand her options and the consequences of terminating her rights to her child. It is important that the adoptive parents receive certain legal rights from the birth mother to protect them before they form a bond with the child that is unthinkable to sever. That is why the law attempts to protect both sides by specifying the form a relinquishment of parental rights must take, insuring that the mother fully understands the risks and the consequences of her decision. *See Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex.App.-Austin 2000), *pet. denied*, 53 S.W.3d 684 (Tex. 2001); *see also* Tex. Fam.Code Ann. § 161.103 (West Supp.2005) (affidavit of voluntary relinquishment must include statement that parent has been informed of parental rights and duties; statement that relinquishment is revocable, irrevocable, or irrevocable for stated period of time; and explanation of how and when revocation may be accomplished), § 161.1035 (West 2002) (if affidavit of relinquishment does not state that it is irrevocable for certain period of time, affidavit is revocable within ten days of execution). This petition for mandamus requires us to examine the painful consequences of a decision that was rushed and the heartache that follows when the parties ignore the legal protections that are designed to apply to such decisions.

For a mother's relinquishment of her parental rights to be considered voluntary, the parties must follow specific procedures set out in the family code. *See Vela,* 17 S.W.3d at 763–64. None of those safeguards or procedures were followed in this difficult and heartbreaking case, in which Melissa Mata, an unmarried nineteen-year-old who lived at home with her parents, allowed Sam and Laura Gonzalez, the would-be adoptive parents, to take her two-day-old baby home from the hospital without having signed any documents giving up any of her parental rights or bestowing any legal rights on the Gonzalezes.[1] Melissa changed her mind a week later, but the Gonzalezes, understandably distraught at her change of heart, refused to return the child, instead filing the underlying lawsuit in McCulloch County seeking to have Melissa's parental rights terminated. In temporary orders, the trial court granted the Gonzalezes temporary managing conservatorship over the child and excluded Melissa from any possession of the child. Melissa filed her petition for writ of mandamus, attacking both the temporary order and the trial court's refusal to dismiss the Gonzalezes' suit. Although we empathize with all the parties involved, we hold that the trial court abused its discretion in excluding Melissa from possession of her child, and we therefore conditionally grant Melissa's petition for writ of mandamus. *See* Tex.R.App. P. 52.8.

## Factual Background

Melissa learned she was pregnant in 2005 and she believed the father was her ex-boyfriend, Adrian Davis. Melissa was afraid to tell her parents and did not want to upset them because her grandfather had been sick and her uncle had recently died.[2] Melissa therefore concealed her pregnancy, briefly living with her best friend, Clarissa Sanchez, at the very end of the pregnancy. Melissa smoked marijuana once and drank occasionally before she found out she was pregnant but testified that she stopped when she learned she was pregnant. She was unsure of what she should do and in December 2004, she explored abortion as an option, abandoning that idea when she learned she was too far along in her pregnancy. Melissa did not seek regular prenatal care or take prenatal vitamins, but testified that she had a sonogram and ate well during the pregnancy.

At 10:11 a.m. on May 16, 2006, Melissa gave birth to her son. He was slightly underweight and doctors worried that he had enlarged kidneys, but further tests results have been normal. Clarissa had somehow spoken to Sylvia Gonzalez, who is Sam Gonzalez's sister, and Clarissa and Sylvia arranged for the Gonzalezes to come meet Melissa and the baby in the hospital two days later.[3] Sam Gonzalez testified that on May 17, Sylvia called and told him that "[t]he hospital wanted a name for the child. [Melissa] did not want to give it a name; therefore, we presented our name, and that's what they put down on the birth certificate." Melissa said that she allowed the Gonzalezes to choose S.G. as the baby's name "[b]ecause Sylvia told my friend, Clarissa, that they picked out a name."

The Gonzalezes arrived at the hospital at about 11:00 a.m. on May 18 and spoke to Melissa for about two hours. Melissa tes-

---

1. Because several of the witnesses in this case share the same last names, we will generally refer to the individual parties and witnesses by their first names.

2. Melissa lives with her mother and her stepfather, who has raised her since she was in first grade and who she refers to as her father.

3. It is unclear how Clarissa and Sylvia came to be acquainted, who initiated the contact, or what relationship, if any, Sylvia has to the hospital where the baby was born.

tified that the Gonzalezes told her that they "could have an open adoption, and I could be in his life," and "[t]hat I could change my mind up until I signed the actual adoption papers." That same day, based in part on those assurances, Melissa told them she wanted them to adopt S.G. and signed a release allowing the Gonzalezes to take him home from the hospital. She testified that when she allowed the Gonzalezes to take S.G. home from the hospital, she did not want to kiss him because, "I felt that if I kissed him, . . . I wouldn't be able to give him away to them, and I knew how much they wanted a baby."

Melissa was sad and wept for several days after leaving the hospital because she wanted to see and hold S.G., and she testified that she regretted giving S.G. to the Gonzalezes almost immediately but did not tell anyone until she talked to her parents. On May 25, a week after the Gonzalezes took S.G. home with them, Melissa told her mother about S.G., and her mother responded that "if I wanted my baby . . . we can go back and get my baby." Melissa called the Gonzalezes that day and told them she had changed her mind and wanted to raise S.G. herself. Melissa testified that the Gonzalezes led her to believe that she could pick up S.G., so she and her parents drove about five hours from Lubbock to Brady, to the home of Peter and Mary Ann Castro, Laura Gonzalez's brother and sister-in-law.[4] They understood that the Gonzalezes would meet them there, but when they arrived at the Castros' house, the Gonzalezes were not present and did not answer their phone. Melissa and her parents spoke to the Castros for about three hours that night. Contrary to Mary Ann Castro's testimony,

Melissa denied agreeing that S.G. should stay with the Gonzalezes, testifying that she agreed generally with some of the Castros' statements about S.G.'s needs. Melissa testified that she and her parents left and returned to Lubbock about 11:00 p.m. without seeing the Gonzalezes or S.G. because it was so late and they were frustrated: "I was ready to go home because they were giving us the run-around because we were supposed to meet Sam and Laura, not them [the Castros], to discuss the situation with the child."

Two days later, on May 27, Melissa and her parents again drove to Brady to pick up the child, first calling the Gonzalezes to say they were on the way. Sam advised Melissa to bring a change of clothes and a car seat for the baby. Once again, when Melissa arrived at the Castros' house, the Gonzalezes were not there and did not answer their phone. Melissa and her parents waited at the Castros' house, then went to get something to eat. When they returned, Isaac Castro, another brother of Laura Gonzalez and the Gonzalezes' attorney, told Melissa and her parents that they could not have the baby, showing them the hospital release she had signed and indicating that the "paper alone prevented [her] from taking the child." Melissa testified that she wanted to raise S.G. and now knew she could so because she had a job and her parents would help her.

Clarissa Sanchez testified at the hearing that Melissa was unsure about what to do when she learned she was pregnant. She did not want to tell her parents because of her grandfather's illness and her uncle's recent death, nor did she want to tell her ex-boyfriend. About two weeks before the birth, Sylvia Gonzalez called Clarissa and

---

**4.** It seems that the Gonzalezes never gave Melissa their address, instead using Sylvia and the Castros as a buffer between them and Melissa. On May 25, Melissa first called Sylvia, who contacted the Gonzalezes, and the Gonzalezes then called Melissa back, arranging for her to drive to the Castros' house in Brady, not to the Gonzalezes' home.

told her that her brother and sister-in-law might be prospective adoptive parents. Clarissa said she regretted her role in arranging the attempted adoption because she did not want to hurt the Gonzalezes but believed that "this baby should be with Melissa." Clarissa and her mother originally planned to take Melissa's son to their home until the proper legal papers were signed. But Sylvia called and said that the lawyer stated that if the Gonzalezes were going to adopt this baby, the Gonzalezes should take him home from the hospital.

· At the hearing, Sam Gonzalez testified that his sister Sylvia called him on May 16 and told him about Melissa and her baby. On May 17, Sylvia called to say that Melissa did not want to name the baby, so the Gonzalezes chose the baby's name. The Gonzalezes drove to Lubbock on May 18, arriving about 11:00 a.m., and met with Melissa, who told them that she wanted them to adopt S.G. Laura Gonzalez testified that when Sylvia first told her and Sam about S.G., "Sam and I talked back and forth on the phone about what to decide to do here, and we thought it was too fast." Laura said that Clarissa Sanchez's initial plan to take care of S.G. until the adoption papers were signed "was just buying us time so that we could—like I said, it was just very fast with school, and I was thinking if it were just a little bit later on when I was finished and things would be smoother in working this out." Although Laura thought things were happening too fast, she also did not want S.G. to be "bounced around" from home to home, so she told Sam that "[i]t will work itself out." Laura said that at the hospital, "My heart was hurting for Melissa before we even saw the baby." Sam admitted that "at the beginning," he told Melissa that she could change her mind anytime before she signed the adoption papers. Laura denied telling Melissa that they would have an open adoption.

Seven days later, Melissa called to say she had changed her mind and was on her way to pick up S.G. Laura testified that when Sylvia called to say Melissa had changed her mind, Sam "immediately became upset and started crying." The Gonzalezes called Melissa and asked her why she had changed her mind, and she answered, "My parents found out." They pleaded with her and asked to talk to her and her parents to "tell them what kind of parents we want to be." Sam called their attorney, who advised them that "probably we needed to sit down and try to talk to the parents since the parents had just found out that day." However, when Melissa called after she and her parents arrived in Brady, Laura and Sam did not answer and did not offer to meet Melissa and her parents. Laura testified that she and Sam were not avoiding Melissa, but said, "We were so uncertain as to ... what [Melissa's] parents were going to be like. Whether they were going to be upset." The Gonzalezes did not meet with Melissa or her parents that day, nor did they meet Melissa and her parents on May 27, when they again made the trip; the Gonzalezes never told Melissa not to drive to Brady. Sam testified that when Melissa called on May 27, he and Laura had already made plans to be out of town. They again contacted their lawyer, who "advised if you had already made a date ... to go ahead and go, and our lawyer would talk to them about it."

Mary Ann Castro testified that Melissa and her parents came to the Castros' house on May 25, arriving about 8:00 p.m. and leaving about 11:00 p.m. Mary Ann testified that she spoke to them and asked Melissa "what she wanted me to tell Sam and Laura, and she said she wanted to give the baby to Sam and Laura." Mary Ann allowed Melissa to talk to her mother alone, after which Melissa's mother told Mary Ann, "She couldn't hardly take care

of herself. How could she take care of a baby?" Mary Ann testified that she asked Melissa if she was sure she wanted the Gonzalezes to keep S.G., saying, " '[T]he last thing I want is to go to Sam and Laura and you change your mind. That would not be fair.' I turned to her mother, and I said, 'Am I out of line?' She said, 'No. You're right. She would have to sign the papers.' " Mary Ann said Melissa and her parents left soon after, but two days later, Sam called the Castros and said Melissa was driving back to Brady. When she and her parents arrived this time, Mary Ann told them the Gonzalezes were out but would return later that day. Melissa and her parents left to get something to eat and when they returned about two hours later, Isaac Castro showed them the hospital release Melissa had signed; Mary Ann did not recall hearing Castro tell Melissa or her parents that the release "prevented them from taking the baby." Although Mary Ann said Melissa and her parents never asked to see the Gonzalezes or S.G., she admitted that she knew they had come "to pick the baby up."

On May 29, two days after Melissa's second attempt to regain custody of her son, the Gonzalezes filed a petition seeking to have Melissa's parental rights terminated and asking to be appointed S.G.'s temporary managing conservators. As grounds for termination, the Gonzalezes alleged that Melissa had (1) voluntarily left S.G. alone or in the possession of a non-parent and expressed an intent not to return, (2) knowingly placed or left S.G. in conditions or surroundings that endangered the child's well-being, and (3) engaged in conduct that endangered the child. *See* Tex. Fam.Code Ann. § 161.001(1)(A), (D), (E) (West Supp. 2005). On May 30, the trial court signed a temporary restraining order excluding Melissa from possession of the child and enjoining her from attempting to remove him from the Gonzalezes' custody. Melis-

sa filed a motion to dismiss, arguing that the Gonzalezes lacked standing to seek to terminate her rights. On June 12, the trial court held a hearing and made an oral ruling that the Gonzalezes had standing under an affidavit of relinquishment signed by the alleged biological father and under section 102.005 of the family code. *See id.* § 102.0035 (West Supp.2005), § 102.005 (West 2002). The trial court noted that the burden of proof in a termination case is very high, but found that the child was not in danger and ruled that it would maintain the status quo and allow S.G. to remain in the Gonzalezes' home, appointing them as temporary managing conservators. In her petition for writ of mandamus, Melissa complains of the court's refusal to dismiss the underlying suit and its order denying her possession of S.G. We conditionally grant Melissa's petition. As discussed below, it is not clear that the Gonzalezes had standing to bring their termination suit. Assuming without deciding that they do, the trial court abused its discretion in naming them temporary managing conservators and excluding Melissa from possession of the child.

## Discussion

In this original proceeding, Melissa complains that the trial court abused its discretion in excluding her from any access to her child, naming the Gonzalezes managing conservators of S.G., and refusing to dismiss the Gonzalezes' suit for a lack of standing.

■ Mandamus relief is available only if a trial court clearly abuses its discretion and the relator shows she has no adequate remedy by appeal. *In re Southwestern Bell Tel. Co.,* 35 S.W.3d 602, 605 (Tex. 2000); *In re Lewin,* 149 S.W.3d 727, 734 (Tex.App.-Austin 2004, orig. proceeding). Because temporary orders in a suit affect-

ing a parent-child relationship are not subject to interlocutory appeal under the family code and because there is a need to resolve issues related to child custody quickly, courts have held that mandamus is an appropriate vehicle to challenge a lack of jurisdiction in child custody matters. *Lewin*, 149 S.W.3d at 734; *see* Tex. Fam. Code Ann. § 105.001(e) (West Supp.2005) (no interlocutory appeal from temporary orders). Further, mandamus may be used to challenge a temporary order that deprives a parent of the physical possession of her child. *See In re Aubin*, 29 S.W.3d 199, 202 (Tex.App.-Beaumont 2000, orig. proceeding). Because Melissa challenges the trial court's jurisdiction over this cause and because the temporary orders deprive a parent of possession of her child, we hold that mandamus is appropriate.

■ We note that at the time Melissa filed her petition for mandamus and the Gonzalezes filed their response, the trial court had not yet signed a written order memorializing its oral ruling at the hearing.[5] The trial court made its ruling and then asked the Gonzalezes' attorney to prepare an order for signature. Although we do not have a written order to consider, we believe that the court's ruling is sufficiently shown by the reporter's record for us to consider this petition. *See* Tex. R.App. P. 52.3(j)(1) (appendix to mandamus petition must be certified or sworn copy of order being challenged "or any other document showing the matter complained of"); *In re Perritt*, 973 S.W.2d 776, 779–80 (Tex.App.-Texarkana 1998, orig. proceeding) ("we find the combination of oral and written orders in this case sufficient to place before us the complaints made the basis of relators' petition for writ of mandamus"). We decline to penalize Melissa for the lack of a written order when the responsibility for preparing the

order was given to the Gonzalezes, who, if we were to require a written order for mandamus consideration, would have little incentive to prepare the order quickly.

*Temporary Orders*

The trial court stated, "Generally, on . . . temporary orders, if the Court is satisfied that there's no danger to the child, the status quo is maintained, and we order a home study," and appointed the Gonzalezes temporary managing conservators. The status quo at the time of the hearing was set by the trial court's May 30 ex parte temporary restraining order, which gave the Gonzalezes custody of S.G., enjoined Melissa from disturbing them or removing S.G. from their possession, and "excluded [Melissa] from possession of the child." In its June 12 oral ruling giving the Gonzalezes managing conservatorship, the trial court continued to exclude Melissa from possession of S.G.

■ In determining who should have possession of a child, the primary consideration is the child's best interest. Tex. Fam.Code Ann. § 153.002 (West 2002). A parent has the right to physical possession of her child, subject to a court order, an affidavit of relinquishment, or an affidavit designating another as managing conservator. *Id.* § 151.001(a), (d) (West Supp. 2005). A mother's rights to "the companionship, care, custody, and management" of her child are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (quoting *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)); *see Vela*, 17 S.W.3d at 759. "[T]he interest of parents in the care, custody, and control of their children [ ] is perhaps the oldest of the

---

**5.** The parties have not informed us that any such order has been signed; therefore, we assume that no written order has yet been signed.

fundamental liberty interests recognized by" the courts. *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

Although a trial court need not make the same findings on temporary orders as it must in making a final order of termination, *see* Tex. Fam.Code Ann. §§ 105.001, 161.001 (West Supp.2005), neither should the court ignore the probable arrangements that will be imposed on final hearing in considering temporary orders. There remains a strong presumption that the parent should be named temporary managing conservator. *See Aubin,* 29 S.W.3d at 203; *see also* Tex. Fam.Code Ann. § 153.131 (West 2002) ("unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator").

We agree with the Gonzalezes that section 153.131 applies to final orders of conservatorship. However, in making temporary orders, a trial court should apply the presumptions "in favor of the guidelines for ... the standard possession order under Chapters 153 and 154." *Id.* § 105.001(g). Section 153.252 establishes a rebuttable presumption that the standard possession order, which appoints the parents as managing conservators, is in the child's best interest. *Id.* § 153.252 (West 2002). Therefore, in making temporary orders, the court should start with a presumption that a child's parent should be appointed managing conservator, as provided by the standard possession order. Only upon a verified pleading or affidavit and a showing that the placement of a child with his parent could endanger the child's well-being should a trial court grant temporary managing conservatorship to a non-parent. *See id.* § 105.001(c); *Aubin,*

29 S.W.3d at 203 (citing *Lewelling v. Lewelling,* 796 S.W.2d 164, 167 (Tex.1990)) ("The strong presumption in favor of parental custody requires that the nonparent seeking custody affirmatively prove by a preponderance of the evidence that appointment of the parent as managing conservator would significantly impair the child, either physically or emotionally.").

The evidence did not show and the Gonzalezes's petition and supporting affidavit did not allege facts showing that Melissa might be a danger to the baby. In Sam's affidavit, he says that Melissa told them that she did not want to keep S.G. and that she wanted the Gonzalezes to adopt him; that S.G. was underweight and had enlarged kidneys at birth; and that he believed Melissa "attempted to abort the baby beyond the first trimester of pregnancy" and "failed to follow even the minimum standards of prenatal care," statements that are both hearsay and unsupported by factual allegations. As grounds for termination, the Gonzalezes alleged that Melissa had left S.G. with them, expressing an intent not to return, placed him in surroundings that endangered him, and engaged in conduct that endangered him. *See* Tex. Fam.Code Ann. § 161.001(1)(A), (D), (E). There was testimony that Melissa considered obtaining a legal abortion when she first learned she was pregnant and was uncertain of how she could care for the child, but she did not have an abortion. Although there was some testimony that she took some actions that were dangerous in the early stage of her pregnancy, Melissa testified that she did not smoke, drink, or use drugs after she learned she was pregnant. After one brief visit two days after his birth, she allowed the Gonzalezes to take S.G. home, intending that they should adopt him. She changed her mind seven days later, when, observing her sadness, her parents learned of the baby's

birth and told her that they would support her if she wanted to raise S.G. Melissa immediately informed the Gonzalezes that she had changed her mind, and twice drove several hours to try to take possession of her child. S.G. was never placed in a dangerous situation, he was placed with the Gonzalezes, and Melissa's actions do not amount to conduct that endangered his well-being. As for the claim that she allowed the Gonzalezes to take the child with an intent not to return, that argument ignores the Gonzalezes' admission that she was promised she could change her mind, which is exactly what she did. She did not sign an affidavit of relinquishment or any document that can be construed as an initiation of a relinquishment of her parental rights. *See Vela*, 17 S.W.3d at 762–64. Even if she had signed an affidavit of relinquishment, such an affidavit is generally revocable for ten days following its signing, *see* Tex. Fam.Code Ann. §§ 161.103(a)(9) & (10), (e), (f), .1035 (affidavit of relinquishment may be made irrevocable for up to sixty days, otherwise revocable within ten days of execution), and is considered involuntary if procured by an unenforceable or broken promise. *See Vela*, 17 S.W.3d at 763–64 (unwed, nineteen-year-old birth mother met several times with licensed adoption agency, chose and met adoptive parents, and signed affidavit of relinquishment after being admonished that it could not be revoked; relinquishment held involuntary because it was induced by agency's promises related to unenforceable "sharing plan" that would allow birth mother post-adoption contact with child).

This is a difficult and painful case no matter the outcome. We have no doubt that the Gonzalezes have S.G.'s best interest in mind and dearly love him. They have surely acted out of love for the child they already consider their own. However, they have no legal rights to this child, only a deep emotional bond. Melissa is S.G.'s mother, she has not signed any properly executed document relinquishing her rights, and there is no evidence that she will be an unfit parent or has endangered S.G. As the Gonzalezes themselves told her she could, she changed her mind within one week of sending S.G. home from the hospital with the Gonzalezes.

There was no evidence to support the trial court's decision to disregard the presumption that Melissa as the parent should have temporary possession of S.G.[6] *See Aubin*, 29 S.W.3d at 203–04 (reversing temporary orders appointing non-parents as temporary possessory conservators because evidence did not overcome presumption in favor of parental custody, non-parents did not show that appointment of parent "would significantly impair the children's physical health and emotional development," and "there has been no finding that would support the intrusion of the trial court on the liberty interest recognized in *Troxel*"). *Cf. In re K.L.R.*, 162 S.W.3d 291, 300–01 (Tex.App.-Tyler 2005, no pet.) (affirming temporary restraining order granted based on allegations that child's present environment might endanger physical health or emotional development, pointing to mother's deteriorating condition, felony arrests and jail sentences, and fears that she might flee with child). Further, Melissa's consent to the Gonzalezes' taking S.G. home from the hospital was made two days after giving birth, when she was unsure how she herself

---

6. There may be circumstances where retaining the status quo with a non-parent is in the child's best interest, but in this case, the short period of time the child had been with the Gonzalezes (eleven days when they filed suit) and the probable outcome of their suit for termination do not favor maintaining the status quo against the wishes of the child's mother.

could take care of her baby. Melissa was given no time to consider or reconsider the gravity of her decision, and her decision to allow the Gonzalezes to take S.G. home from the hospital was induced by the assurance that she could change her mind, a promise that was broken when the Gonzalezes' worst fears came true and Melissa decided she wanted to raise her child. *See Vela*, 17 S.W.3d at 762–63.

■ While the trial court both empathized with the Gonzalezes' plight and their attachment to the child, it also recognized the heavy burden they would have to carry to terminate Melissa's rights. Perhaps the court was attempting to allow the Gonzalezes a little more time with S.G. before Melissa's parental rights would be legally recognized. This delay, however, was not in the child's best interest. In *Vela*, the court's eventual decision that the mother's relinquishment of her parental rights was not voluntary was made more painful by the length of time the child had already lived with the would-be adoptive parents, almost two years. *See id.* at 764–65. The temporary orders entered by the trial court would have the same effect of prolonging the child's stay with the Gonzalezes, despite the probable outcome of their termination suit. The trial court misplaced the burden of proof by not requiring the Gonzalezes to rebut the presumption in favor of granting Melissa possession of the child, given the paucity of their legal claims to possession, most notably, the lack of an affidavit from Melissa relinquishing her parental rights, as required by the family code.

### Standing

Only certain individuals or entities have standing to file a suit affecting the parent-child relationship, including the child's parents, someone with a court-ordered right to visitation or access, a non-foster parent who has had actual possession of the child for at least six months within ninety days of filing suit, a person designated as a managing conservator in an affidavit of relinquishment, or a person named by a parent as a prospective adoptive parent in a verified statement to confer standing. Tex. Fam.Code Ann. § 102.003(a) (West Supp.2005). A suit "requesting only an adoption or for termination of the parent-child relationship joined with a petition for adoption" may only be filed by a stepparent or someone who, "as the result of a placement for adoption," has had actual possession of the child "at any time during the 30–day period preceding the filing of the petition"; has had actual possession of the child for at least two of the three months preceding the suit; or "whom the court determines to have had substantial past contact with the child sufficient to warrant standing to do so." *Id.* § 102.005.

The Gonzalezes contend that Adrian Davis, the baby's father, conferred standing on them by signing an affidavit of relinquishment so the Gonzalezes could adopt S.G. *See id.* §§ 102.003(a)(10), .0035. They further argue that they have standing under subsections 2 and 4 of section 102.005. *See id.* §§ 102.005(2), (4).

A parent-child relationship is established between a man and a child by an unrebutted presumption of paternity; an unrevoked and unchallenged acknowledgment of paternity; an adjudication of paternity; the man's adoption of the child; or his consent to his wife's use of assisted reproduction. *Id.* § 160.201(b) (West 2002); *see id.* § 101.024 (West Supp.2005) ("parent" defined as child's mother, presumed father, legally determined father, adjudicated father, acknowledged father, or adoptive parent). An "acknowledged" father is a man who has established a parent-child relationship under the family code, and an "alleged" father is a man who claims or is claimed to be the father, but whose pater-

nity has not been determined. *Id.* §§ 101.0010, .0015 (West 2002). A parent may execute a statement to confer standing on a prospective adoptive parent, which may only be used to give the prospective adoptive parent standing to bring suit for adoption or termination. *Id.* § 102.0035(a), (c).

Melissa testified that she "believed" Adrian Davis was S.G.'s father. However, Davis has not been adjudicated as the father. He and Melissa were not married, so there is no legal presumption that he is S.G.'s father. *See id.* § 160.204 (West Supp.2005). There has been no acknowledgment of paternity pursuant to the family code. *See id.* § 160.302(a)(2) (West 2002) (acknowledgment of paternity must be signed by both alleged father and mother); *see also id.* §§ 160.301–.309 (West 2002 & Supp.2005) (governing acknowledgments of paternity). Therefore, there is as yet no parent-child relationship between Davis and S.G., and Davis's affidavit of relinquishment, executed as an alleged father, does not confer standing on the Gonzalezes.

The Gonzalezes also argue that they have standing under subsections 2 and 4 of section 102.005, which allow a suit "requesting only an adoption or for termination of the parent-child relationship joined with a petition for adoption" to be brought by someone who (1) due to a placement for adoption, has had actual possession of the child at any point during the thirty days preceding the filing of suit, or (2) is determined to have had substantial past contact with the child sufficient to warrant the conferring of standing. *See id.* § 102.005(2), (4).

The Gonzalezes' petition did not request to adopt S.G., nor was it joined with a petition for adoption; the Gonzalezes sought only to terminate Melissa's rights and to be named managing conservators.[7] Therefore, it appears that section 102.005 does not apply to this cause.

Even if section 102.005 does apply, it is not clear that the Gonzalezes have possession of S.G. "as the result of a placement for adoption." *See id.* § 102.005(2). "Placement for adoption" is not defined in the family code or case law, but it seems more often used to refer to formal adoption proceedings through a licensed adoption agency, not such an informal, private arrangement as this. *See, e.g., In re C.G.B.,* 163 S.W.3d 805, 807 (Tex.App.-Texarkana 2005, no pet.) ("the Department must set out its goals for the child, specifying how it intends to seek a 'permanent safe placement' for the child, whether by termination and *placement for adoption,* by return to their family, or by other means" (emphasis added)); *Myers v. Patton,* 543 S.W.2d 22, 25 (Tex.Civ.App.-Texarkana 1976, no writ) ("when the appellant left the child in the hands of the court for *placement for adoption* she declared her intent to abandon the child to others" (emphasis added)); *but see In re R.D.S.,* 902 S.W.2d 714, 720 (Tex.App.-Amarillo 1995, no writ) (using "placement for adoption" in case involving private adoptive arrangement between birth parents and adoptive parents; "in her view, one cannot abandon a child whose *placement for adoption* emanates from a desire to help the child" (emphasis added)). At the time the Gonzalezes took possession of the child, Melissa had not signed an affidavit of relinquishment of her parental rights or any written documents expressing an intent to place S.G. for adoption. She did state that intent orally two days after her baby was

---

7. Indeed, the Gonzalezes could not adopt S.G. until he had lived with them for at least six months, although that requirement may be waived upon a showing that waiver is in the child's best interest. Tex. Fam.Code Ann. § 162.009 (West 2002).

born, after visiting for about two hours with the Gonzalezes, total strangers, and after being assured that she could change her mind at any time before the adoption was final. Further, the statute confers standing on someone who has had possession of the child "at any time during the 30–day period preceding the filing of the petition." Tex. Fam.Code Ann. § 102.005(2). Although the code does not explicitly state that the child must be at least thirty days old, such a conclusion is logical from the language of the statute.

Finally, although the Gonzalezes have had possession of S.G. since he was two days old, they only had him for seven days before Melissa changed her mind and wanted to take him back. On the day they filed their petition, he had been in their possession for only eleven days, and he had been with them for less than one month at the time of the hearing. Other provisions of the family code require a would-be adoptive parent or conservator to have custody of a child for significant periods of time before a court may take action. *See, e.g., id.* § 102.003(9), (11), (12) (conferring standing on individuals with possession for at least six months or on foster parent who has had child for at least one year), § 102.005(3) (conferring standing on adult who has had actual possession for two months or more), § 162.009 (West 2002) (court may not grant adoption until child has lived with petitioner for at least six months). Since May 25, seven days after taking possession of the child, the Gonzalezes have withheld S.G. from his natural mother in opposition to her wishes. Given the family code's emphasis on much longer periods of possession to confer standing, we seriously doubt that their possession of S.G. for seven days before Melissa sought to regain custody of her son can be considered "substantial past contact" sufficient to confer standing on the Gonzalezes to bring this termination action. *See id.* § 102.005(4).

■■ Although the Gonzalezes did not attempt to suggest to the trial court that Melissa's signing of the release somehow conferred standing on them, the release was discussed at considerable length during the hearing. Melissa testified that the Gonzalezes' attorney pointed to the release and told her that it gave the Gonzalezes possession of S.G. and prevented her and her parents from taking the baby on May 27, after their second trip to Brady to pick him up. The release does not confer standing of any kind, nor can it be interpreted as some form of relinquishment of parental rights; it served only to protect the hospital from liability for releasing S.G. to the custody of someone other than Melissa. *See id.* § 161.108(a) (West 2002) (mother may sign release allowing designated person to take child from hospital). Any reliance on the release to bar Melissa from regaining possession of S.G., if such occurred on May 27, was a misrepresentation of the legal effect of that document. To confer standing, a statement must satisfy all of the requirements set forth in section 102.0035. *See id.* § 102.0035. The hospital release, the only document Melissa signed, does not satisfy the statute and did not confer standing on the Gonzalezes to file their termination suit.

On this record, we are uncertain whether the Gonzalezes have standing to bring their suit. We need not decide this issue, however, because we have determined that even if they do have standing, the trial court abused its discretion in naming them temporary managing conservators.

### Conclusion

This case illustrates the dangers presented by informal and rushed adoption arrangements. Despite the goodwill of all the parties, the arrangement was made without the legal protections offered by affidavits of relinquishment or statements

conferring standing. These hurried proceedings left both the birth mother and the would-be adoptive parents at risk for heartbreak. Although Melissa signed the release allowing the Gonzalezes to take S.G. home from the hospital, she signed it without the advice of an attorney and within fifty hours after giving birth, relying on the Gonzalezes' promise that she could change her mind anytime before the adoption papers were signed. *See* Tex. Fam. Code Ann. § 161.103(a)(1) (West Supp. 2005) (affidavit of relinquishment cannot be signed "before 48 hours after the birth of the child"). She was urged to make this decision too quickly and without benefit of legal counsel, parental advice, or time to fully consider the momentous consequences of her decision. When she reconsidered and realized that her parents would support her decision to raise her child, she acted quickly and made significant efforts to get him back. The rush to send the child home from the hospital with the Gonzalezes two days after his birth, without the benefit of an affidavit of relinquishment that builds in warnings and protections for both the birth mother and the adoptive parents, was ill-considered and tragic for all concerned. It allowed the Gonzalezes to form deep emotional ties to the child without having any legal rights to his possession.

■ It is not clear that the Gonzalezes have standing to bring their suit to terminate Melissa's rights. Even assuming they have standing, the trial court abused its discretion in allowing the Gonzalezes to maintain possession of S.G. The Gonzalezes filed their suit in an attempt to create rights to the child, legal rights that they do not now have. Melissa has not relinquished her parental rights, and there was no evidence supporting the Gonzalezes' alleged grounds to exclude Melissa from possession or showing that Melissa might pose a danger to the child. The trial court abused its discretion in naming

the Gonzalezes temporary managing conservators and excluding Melissa from possession of S.G.

We conditionally grant Melissa's petition for writ of mandamus and vacate the trial court's temporary order. The case is remanded for further consideration and the writ will issue only if the trial court fails to take appropriate action in accordance with this opinion.