# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON REHEARING

## NO. 03-12-00487-CV

**J. M. and A. G., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT
### NO. 2011-1242, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Our opinion and judgment dated April 19, 2013, are withdrawn, and this opinion is substituted in their place.

In June 2011, the Texas Department of Family and Protective Services filed a petition seeking custody of father J.M. and mother A.G.'s children, T.M. and A.M., based on allegations that the children were being neglected and that T.M. was being abused. The Department also sought custody of H.M., a daughter born the day the Department filed its petition. At the time of trial, son T.M. was four and one-half years old, daughter A.M. was three and one-half years old, and H.M. was not quite one year old. The Department asserted that T.M., who had numerous physical and developmental problems, had been injured while in his parents' care, sustaining in three separate incidents a broken arm, a cut over his eye that required ten stitches, and a black eye. The Department

alleged that several witnesses were concerned that J.M. was abusive or at least neglectful of T.M. and was endangering him through his erratic behavior and use of alcohol. Although earlier allegations of neglect and abuse had been ruled out, the Department was concerned because both J.M. and A.G. had prior arrests for marihuana possession, J.M. had undergone treatment for cocaine addiction and continued to use alcohol and marihuana, and J.M. had difficulty controlling his temper and was verbally aggressive. T.M. was placed in a therapeutic foster home where he could receive appropriate medical care, and A.M. and H.M. were placed together in another foster home. After eleven months, the Department sought termination instead of reunification, and a jury trial was held in May 2012. The jury determined that J.M.'s and A.G.'s parental rights should be terminated and that termination was in the children's best interest, and the trial court signed a final order in accordance with those findings.

Both J.M. and A.G. appeal, attacking the sufficiency of the evidence to support termination under section 161.001(1)(D) or (E), the statutory grounds relied upon for termination. J.M. also argues that the evidence is insufficient to show statutory grounds for the termination of his rights or to support the jury's findings that termination was in the children's best interest, that J.M. had the required mental state, or that the Department should be appointed managing conservator. We affirm the trial court's final order of termination.

**Summary of the Evidence**

Amanda Tolleson testified that she worked as T.M.'s night nurse for about two and one-half years, helping the family from 8:00 p.m. to 6:00 a.m. Tolleson was with the family during A.G.'s pregnancies with A.M. and H.M., and she formed a personal relationship with J.M. and A.G.

2

and spent time with them outside of work. Tolleson testified that she smelled marihuana on J.M. occasionally and that she witnessed him use it "a couple of times." She never saw other drugs in the house. Tolleson said J.M. "drank on a daily basis" and had a very high tolerance for alcohol. She did not believe his marihuana or alcohol use influenced his behavior or endangered the children.

When Tolleson started working with the family, T.M. was on a ventilator and could not breathe on his own, was deaf, could not take anything by mouth, could not sit on his own, and could not speak. T.M. later came off the ventilator and needed oxygen periodically, and Tolleson said J.M. "was knowledgeable of [T.M.]'s medical needs and how to provide for them." Tolleson testified that the parents got training in early childhood intervention and were instructed to gently push T.M. to teach him balance and how to fall without injuring himself.

Tolleson testified that for most of the time she was with the family, J.M., who was unemployed, was the primary caregiver and would clean up the children's toys, give them baths, change diapers, feed them, and care for their needs. Tolleson said that the house was filthy and that, although J.M. tried to clean up or do some dishes, "it was out of hand." Tolleson never saw A.G. help clean, and J.M. sometimes called A.G. lazy or threatened to leave because of it.

Tolleson's impression of J.M. as a father was that he "wasn't very loving, didn't seem to have a bond with [T.M. and A.M.], verbally and physically abusive." Tolleson testified that J.M. "would yell and be verbally—he would make inappropriate verbal commands," although she did not think T.M. could hear J.M.'s yelling. She believed J.M. was abusive with the way he signed at T.M. but admitted that she knows very little sign language. Although Tolleson was "fearful" of J.M., she never saw him strike the children with his fists. She did, however, see marks on T.M. that

3

she believed were caused by being spanked with a belt, and during her time with the family, Tolleson said she saw daily or weekly "aggravation":

> just spanking for different reasons, grabbing them by the foot to pick them up, you know, upside down, hanging upside, throw—throwing them into the baby bed, you know, from the doorway, maybe, however they landed. Just things like that. Just constantly aggravating, just—you know, the squeezing, the hitting—throwing things at them, hitting them in the head with toys.
>
> You know, sometimes he'd just sit there and just bang [T.M.] in the head with a toy, no matter how hard it was, just to do it until [T.M.] would crawl away. But just—it was just a constant aggravating, a constant doing something to—pick on him, it seemed like. You know, push him over, kick him out of the way . . . grab him, push him down when he was pulled up on furniture.

When asked why she feared for the children's safety, Tolleson said, "Same thing: punishing them when nothing is happening; spanking them over doing it; throwing them into the baby bed from the doorway; knocking them down; hitting them with objects; spanking them with belts."

Tolleson testified that A.G.'s interaction with the children was minimal but never abusive. A.G. never advocated for the children or defended them against J.M.'s abuse, however, and Tolleson testified that A.G. usually ignored the children and "would sleep most of the time or watch television." Tolleson admitted that she was only present with A.G. and the children for about two hours in the evenings before the children went to bed, and she did not know how A.G. behaved during the rest of the day, other than hearing complaints from J.M.

Tolleson testified that when T.M. injured his head and needed stitches, J.M. explained that he had been using his foot to push T.M. in his rocking chair when he pushed too hard, causing T.M. to fall into a piece of furniture and cut his head; A.G. was not at home at the time. Tolleson

4

was asked about an instance when she saw significant bruising on T.M.'s face, body, and leg, and she said J.M. told her that T.M., who was about two years old at the time, had wrenched his arm out of J.M.'s hand and had fallen or thrown himself onto the rocks in the driveway. Finally, Tolleson testified that when T.M. broke his arm, J.M. and A.G. gave conflicting stories about how it happened, although both parents explained that T.M. had fallen on his arm. J.M. said T.M. started to fall and stuck his arm out, but Tolleson was skeptical because T.M. lacked that reflex and was undergoing therapy to learn it. She said one of the therapy exercises was "to push him forward so he would learn . . . to try to catch himself," and that before learning that reflex, T.M. would simply fall and "would always have a knot on the back of his head or his forehead." Tolleson testified that after T.M. broke his arm, she asked A.G. "when it was going to stop," and A.G. said he "was never going to be normal"; Tolleson was not sure whether A.G. was referring to T.M. or to J.M.

As for J.M.'s treatment of A.M., Tolleson saw J.M. interact with A.M. "in a positive way from time to time that didn't turn into a negative situation." Tolleson said that A.M. used to be very happy to see J.M. and would run up to hug him, but that "things would just get out of hand" because J.M. would take his rough play too far. Tolleson testified that the first day A.M. came home from the hospital as an infant, J.M. threw her "up in the air into the ceiling fan," held her by her foot, and "maybe hugg[ed] her too tight," and Tolleson thought J.M. was trying to get a reaction from her and A.G. When A.M. was about one year old, Tolleson noticed that A.M. would "beg" during meals, and that J.M. "would hit her, push her back onto the ground and, you know, tell her she was begging or tell her, Down. And she'd throw herself down, or she'd just close her eyes and wouldn't open them for a long time." Tolleson further testified that she saw A.M. with a black eye three times

5

but was not present when they occurred; one time J.M. and A.G. told Tolleson that A.M. fell, and another time they said T.M. hit her in the face with a toy. Tolleson was skeptical because of her observations of the way T.M. played and his strength.

Tolleson testified that she took photographs of some of T.M.'s bruises and made notes about bruises she saw on the children, but she did not discuss those incidents with her fellow nurses beyond notes in her reports for the nurse who followed her shift. She did not "document inappropriate punishment. That's not part of a nursing assessment," nor did she show her photographs to the other nurses because they might tell the family, who "would get rid of me. And then who would [T.M.] have there?"

Tolleson's friend Crystal Lucas testified that she met J.M. and A.G. when Tolleson asked if Lucas and her husband would help move the family into a new house. A.G. was about seven months pregnant with H.M. at the time, and J.M. was not present. Lucas testified that she could not go inside the house from which the family was moving because "[t]he smell from cat feces, dog feces was unbearable." Lucas said at one point she saw A.M. reach for A.G., seeking to be picked up. A.G. leaned down, and A.M., who was about one and one-half or two years old, "dropped to the ground as if she was—like as if her mother was going to strike her." She "dropped down to her knees and then just fell forward onto the ground and just—like, she laid there."

Vea Hodo, a nurse who worked the day shift for the family for about eleven months, testified that in her time at the house, J.M. and A.G. usually woke between 9:30 and 11:00 a.m. She also testified that neither parent helped care for T.M. after Hodo arrived at about 6:00 a.m., leaving all of his care to Hodo. Hodo initially also tried to take care of A.M. in the morning because she

6

usually had a wet diaper and was hungry, but her parents were not yet awake. J.M. and A.G. insisted that Hodo stop, saying that if she changed A.M.'s diaper, she would cry to be fed. Hodo said J.M. and A.G. "did not want to be bothered with her," so they told Hodo to leave A.M. alone.

Hodo testified that the house was "a pigsty. It was filthy. Most of the time, there was dirty dishes in the sink, food all over the kitchen, a litter box overflowing in the bathroom, dust everywhere. There was dried dog poop under the rocking chair in the kids' bath—bedroom." She said the dirtiness of the house was not temporary, but was a "way of life." Hodo testified that she would not eat anything out of the kitchen and that when she used the bathroom, she cleaned the toilet before using it. Hodo's job required her to clean and sterilize T.M.'s medical supplies, but the sink was usually full of dirty dishes, so Hodo used the bathroom sink, a small tub from the hospital, or another container, using her own soap to wash her hands and clean the supplies. Hodo testified that there were so many fleas in the house that she had to spray repellent on her arms or legs to avoid being bitten. Hodo testified that in her opinion as a nurse and parent, the house was not in proper condition to raise two small children. Hodo also testified that she saw a "water bong pipe and a glass pipe" in the house and that J.M. once told her he would fail a drug test if he had to take one.

Hodo saw very little affection between A.G., J.M., and the children unless a therapist was present, they were at a doctor's appointment, or there was "someone to impress," and J.M. called T.M. "stubborn," "stupid," and "retard." Hodo remembered only two instances when she saw J.M. have a loving interaction with T.M., and she said A.G. did not show any "motherly instinct toward the children." Hodo never saw either parent read to T.M. or try to help him learn to spell and said that when T.M. began attending preschool when he was three, he "just blossomed," learned to

7

interact with other children, signed more, and learned to walk with his walker. Hodo said that although she was fearful of J.M., she stayed with the family for almost a year because she loved taking care of T.M. and felt the children needed some love and attention.

When Hodo was asked about the parents' explanations for T.M.'s injuries, she testified that J.M. and A.G. gave her three different explanations for how T.M. cut his head. She also testified that after that incident, T.M. appeared to be frightened of J.M. and, when J.M. entered a room, "would immediately move towards me, sit between my feet, climb up on the couch beside me. He would stop doing whatever he was doing and just freeze. And it—he quit sitting in his rocking chair. If he was in the rocking chair, as soon as [J.M.] came in the room, he would immediately get out of it and sit on the floor or—or scoot over next to me." Hodo also said she was given different explanations about how T.M. broke his arm. Finally, when asked about the incident in which J.M. claimed T.M. wrenched his hand away and threw himself face first onto the driveway, Hodo said J.M.'s explanation was inconsistent with her observations of T.M.'s behavior.

Aside from those discrepancies, she was also skeptical of the parents' explanations because T.M., when he fell backward "always landed on his bottom" and lacked the reflex to put his hands out to catch himself. At the time he broke his arm, the nurses and parents were doing physical therapy to teach him to catch himself, but "it was just impossible for me to imagine him catching himself falling backwards." Hodo never saw T.M. pull away or throw himself down and she testified that he could not stand or walk unassisted and was a "very, very cautious child" who would not hurt himself. She noted that T.M. was injured on weekends when no nurse was present and said, "I just don't believe that—that these things could have happened the way that they said they did."

8

Hodo was asked about her thoughts on the children being returned to J.M. and A.G.'s care, and she said:

> My fears is that [sic] it will start all over again; that the—it's a—to me, it's a Doctor Jekyll/Mr. Hyde cycle. It will just, you know, be nice for just a little bit, and then something will happen. And, boom, we'll be right back where we—where we were. And whether—like the every-month-and-a-half cycle of [T.M.] being hurt.

Jennifer Rochelle, A.M. and H.M.'s foster mother, testified that when A.M. first came to live with the Rochelle family, she had anxiety at bedtime, "crying and sobbing." A.M. also "did a lot of self-harming," banging her head, biting herself, scratching at her eyes. For the first six months, A.M.'s behavior changed when she had visits with her parents:

> In the beginning, she changed behavior. Before, she would cry and get anxious and start the stuff before. About January [about five months before trial], those behaviors stopped before. But consistently through the behavior after the visits, she always regressed. She would regress in her language, she would regress in her behaviors, and she would start up some of the self-harming, you know, if we had reached a point where she would stop.

That kind of behavior would usually last about forty-eight hours after a visit, but "once the visits have stopped, we haven't seen any of those behaviors."

Rochelle said that A.M. was having difficulty with toilet training, saying, "[T]he biggest wall that we're having is she does not feel when she's wet or poopy in a diaper or a Pull-up. And we've really come to believe that she's desensitized to it." A.M. had made good progress with speech therapy and reading and had recently gotten glasses to assist her with a vision impairment. Rochelle and her husband hope to adopt the girls, plan to continue the girls' relationship with T.M., and are open to the girls having a continuing relationship with their biological grandparents.

9

Sally McWithey, the children's court-appointed special advocate, had been involved with the children for about ten months. She said that T.M. was in a medical foster home with two adults and three other children, one of whom also has special needs, and that his foster mother is a nurse. McWithey observed many of the parents' weekly visitations and saw a lack of supervision and heard the parents have conversations with the children that were "adult conversations that should not have been discussed with the children." McWithey testified that A.G. "is just kind of there. Not a whole lot of interaction," but that J.M. was loving and appropriate and "always plays with the kids a lot and seems to take care of the diaper situation and the runny noses and all that."

McWithey went to A.G. and J.M.'s house twice. On her first visit, she noticed a "horrible" septic smell, large gaps in the home's skirting, and a missing front step. On the second visit, the exterior problems had been fixed, but the floor inside was filthy, the walls were dirty, there was a hole in an interior wall as if someone had kicked it, and the baby bed was dirty. She believed the house was dirty enough to affect the children's health or safety.

McWithey did not believe that the parents had changed very much in response to the services they had completed and said "there's a lot of irresponsibility on—on their part." She had not seen the progress described by the parents' therapist in the areas of "[r]esponsibility, maturity, providing," and did not "feel like they had progressed where they should have to be getting these children back." McWithey said that although J.M. had not expressed anger at her, he was "a very angry person." She did not have a specific example of the lack of progress she saw with his anger management but said, "You know, I mean, kind of like you just—when you talk to somebody and you go, There's something here just isn't—it just isn't—isn't right." McWithey believed it was

10

in the children's best interest for the parents' rights to be terminated and for their current foster families to adopt them.

Gloria Olivo-Mendoza, the family's Department caseworker, testified that the Department changed its goal from reunification to termination because of reports by the parents' therapist, progress reports on the children's behavior and conditions, and notes from the protective parenting class the parents attended. She also testified that J.M. or A.G. had not taken responsibility for T.M.'s injuries, which she believed they inflicted. The Department was concerned that the children were particularly vulnerable because of T.M.'s special needs and all of their young ages.

Olivo-Mendoza testified that A.G. and J.M. maintained contact with her throughout the case, worked the required services, attended their scheduled visits, and took required drug tests, all with negative results. J.M. asked her what more he could do and complied with most of the Department's requests, although he had not maintained steady employment. Olivo-Mendoza believed that the parents' original therapist had moved "beyond the realm of becoming—of being a therapist," so she asked the parents to change therapists. The parents had complied, but their new therapist could not testify because she had not had enough time to form an opinion.

Olivo-Mendoza testified that J.M.'s "anger issue was one of the major things that was a risk and a safety issue for the children." Olivo-Mendoza sometimes had difficulty approaching and dealing with A.G. and J.M. and said, "If [J.M.] had engaged in anger management, I think that would not have been the case." She was asked whether her dealings with J.M. improved over time, and she answered, "There were times that it was better, but I can't say that I saw a drastic change, no." For example, Olivo-Mendoza said J.M. reacted angrily to her suggestion that H.M., an infant, be placed

11

to sit on a mat rather than a concrete floor, in case she tipped over. She also testified that J.M. was not particularly attentive to the children, saying, "We felt we needed to see—observe more the engaging of the parent/child bond. We were not visibly seeing that." She acknowledged that her observations and concerns were different than McWithey's. Olivo-Mendoza also testified that the Department's records showed inconsistencies between Tolleson's testimony and her earlier statements to a Department investigator.

Father J.M. was twenty-seven at the time of trial. He testified that in 2005, he completed a four-week program to stop using cocaine and methamphetamine. He had used cocaine twice since rehabilitation, but not since T.M. was born. J.M. admitted to "sporadic" marihuana use before the children were removed, last used it about two years before trial, and said marihuana and cocaine were never in the house during T.M.'s lifetime.

J.M. was at one time diagnosed with bipolar disorder and/or borderline personality disorder, and his more recent evaluations determined that he suffered from situational anxiety and moderate, situational depression. J.M. had been undergoing therapy in the year since the children were removed, and he and A.G. had also undergone couples therapy. J.M. admitted he had an "anger problem" and said he had always been "a high-stressed, high-strung person. I have kind of what's described by my therapist as an explosive type temper." He said his temper would sometimes "escalate very quickly to the point of just being furious" and admitted he had twice gotten so angry during arguments with A.G. that he punched a hole in a wall or door.

Since 2007, J.M. had held a number of jobs, including door-to-door sales, working for a staffing service and a convenience store, selling plasma, and seeking work through a "day

12

labor place." He was a full-time student from November 2010 to July 2011, when he finished his education as a medical assistant, but he had been unable to find employment in that field. In the year since the children were removed, J.M. had a job for about three months, but at the time of trial, he was unemployed and looking for a job.

J.M. testified that T.M. was born with "a congenital diaphragmatic hernia, which is a hole in the diaphragm and—in which the intestines and stomach were actually into the top body cavity, pressing on the left side of his lungs and deviated his heart to the right." T.M. had to have a tracheostomy to assist his breathing and a gastrointestinal tube, and he was on a ventilator at the beginning of his life. He also received cochlear implants in both ears.

J.M. testified that T.M. had trouble supporting himself with his legs and lacked the reflex to catch himself. T.M. got ankle/foot orthotics to help him stand, and J.M. and A.G. were told to work with T.M. on his balance by pushing him to the side or to the front so he would learn balance and how to catch himself with his hands. T.M. did not like it when he was pushed "to the point of not wanting to do it or laying down, throwing a fit," and J.M. said T.M. threw "fits" when he did not want to do something by throwing himself on the ground and banging his head until he got a knot or a red mark on his forehead.

J.M. testified that he sometimes pushed T.M. to work harder and that he believed some of the nurses babied T.M. He said he wanted "to see [T.M.] for what he could be and not use his disability as a reason not to achieve what I knew that he could." He admitted that he "made comments saying that I thought that [T.M.] may have been retarded because he was showing—I was just concerned. He wasn't—he wasn't able to talk. He was showing a lot of signs of autism. I used

13

the word 'retarded' because I was ignorant. It was the only way that I knew to express it." He also said he said something "along the lines of 'don't be lazy,' with the same instance as with . . . the walker . . . with him, you know, not wanting to—not wanting to do any sort of therapies or anything like that. It was my word usage. That's awful. It's not my intent."

J.M. admitted that he sometimes became frustrated with T.M.'s nurses but did not believe his anger with them was ever out of control. J.M. testified that he and A.G. fired one nurse because she did not give T.M. his medications properly, and she then made false or exaggerated reports in retaliation. He testified that up until the children's removal, the family had probably gone through seven or eight different day-shift nurses. He fired some of them "for not administering the medications or not doing things that are supposed to be done, not doing things how we wanted them done." He also said some were fired due to personality conflicts. J.M. testified that Tolleson was untruthful in her testimony, that she had called him and A.G. about two days after the removal "[f]rantic [and] apologetic," that Tolleson told him she was "involved in illegal drugs," and that he and Tolleson "nearly [had] a sexual relationship."

J.M. denied that he hit A.G., kicked T.M. or A.M., hit the children with a belt, or threw toys at T.M. or hit him with a toy in anger. J.M. usually used time-outs for discipline but admitted he had spanked T.M. and A.M. He sometimes tapped T.M. on the head with a toy when they played together and said he had picked up T.M. by his feet and thrown him onto a bed, but only in play. He said he would "alley-oop" T.M. into his crib in a playful manner and that he was "always really close to the crib" when he did that.

J.M. explained how T.M. cut his head and needed stitches, saying:

14

> I was sitting in the chair. He was sitting in front of me in the rocking chair, and I was playing with him, pushing him in the rocking chair, And he was actually really having a blast, jumping up and down and giggling, things like that. And the last time with me pushing and him jumping up and down, he ended up going over, flipping over front ways. And, apparently, he was too close to the entertainment center at that time, and he ended up—he hit his head on the entertainment center.

J.M. said T.M. broke his arm when he pulled his hand away from J.M.'s grip while he was standing, falling to the ground and hitting his arm on the floor. Similarly, T.M. bruised his face and body when he pulled away from J.M. while they walked to the car, falling onto rocks on the ground.

J.M. testified that after T.M. was born, A.G. became very depressed, and that during her pregnancies, she suffered from anemia and preeclampsia. J.M. testified that A.G. went to classes for eighteen months at Le Cordon Bleu, leaving the house at about 5:30 a.m. and getting home around 12:00 p.m. or 1:00 p.m. She also worked at Sam's Club and did an externship at a restaurant. J.M. was asked whether A.G. frequently slept during the day, and he said, "Before she wouldn't frequently sleep through the day, but she was always tired and sluggish. And I really—I'm not a doctor, but I think it had something to do with the situation of postpartum depression." Before the children's removal, A.G. never saw anyone for postpartum depression, but since having H.M., she had gotten treatment and was taking an antidepressant and anti-anxiety medication.

J.M. testified, "My understanding was that if I had completed my services, did everything the Department asked, be in communication with the Department on a weekly basis, drug test at any point in time or anything that they asked, I would have—be reunified with my kids." He said that he had been drug tested periodically during the case and had never had a positive result and that he completed parenting and protective parenting classes. He learned that the Department had

15

changed its intentions from reunification to termination at a status hearing two or three months before trial but could not remember what reason he was given for the change other than that "[t]hey felt that I was not learning—or participating in my services enough."

A.G. testified about T.M.'s medical problems, describing how difficult his first year of life was, the knowledge she and J.M. had to acquire about his medical issues, and the types of instruction they were given to help T.M. develop his physical abilities. She also testified that T.M. "routinely had a knot on his head" because he would bang his head on his crib, apparently to let his caretakers know that he was awake, and that behavior was one of the reasons she and J.M. thought T.M. might be autistic.

A.G. was asked about J.M.'s personality, and she said J.M. might sometimes overreact but that he has never made her feel fearful for her or the children's safety. A.G. testified that J.M.'s anger was made worse by stressful situations and that his dealings with people, including the children, became "a little bit more aggressive" when he was angry and frustrated, but not "over and above what I—what I would normally expect." A.G. said she and J.M. "had many disagreements" and sometimes shouted, but that they went into another room to fight. A.G. said that she was pregnant with H.M. during much of the time Hodo was with the family and that she and J.M. frequently fought about whether she was doing enough around the house. A.G. was asked about T.M.'s three injuries and gave explanations similar to those provided by J.M. Although she agreed that the injuries all occurred while T.M. was with J.M., she did not believe J.M. had abused him. A.G. testified that J.M. never hit her or the children and that if he ever did, she would leave and call the police.

16

A.G. went to culinary school from 2009 until July 2010 from 6:30 a.m. until almost 12:00 p.m. When she did an internship later in her education, she went to school at 8:00 a.m. and ended at 3:00 p.m., and then her hours varied when she did an externship. A.G. testified that she was currently being treated and taking medication for depression. She stated that she suffered from depression after T.M.'s birth but did not seek treatment because she "put all of my energy and focus" into T.M. A.G. became pregnant with A.M. when T.M. was about three months old despite using birth control, and she believed she was "a little depressed" after A.M. was born, but ignored it because she thought it would go away. She sought treatment before becoming pregnant with H.M., but stopped her medications during the pregnancy because she did not think it was safe for the baby.

A.G. was asked about Hodo's testimony. A.G. thought Hodo "testified to the best of her ability, but I don't believe that she remembers everything the way it happened." A.G. disputed Hodo's testimony that the house was filthy and that A.G. never took care of T.M. and A.M. A.G. also denied that she and J.M. forbade Hodo from taking care of A.M. in the morning because they wanted to sleep late; A.G. said that they instructed Hodo to take care of T.M. because that was her job and told her that they would care for A.M. As for Tolleson's testimony, A.G. stated that "Ms. Tolleson was a liar," and said, "I feel like the evidence that Ms. Tolleson is a liar speaks for itself." A.G. testified that Tolleson took many hours off from work for personal reasons while submitting time sheets to her employer stating she had worked her full shifts.

Jeri Jaquith, a licensed professional counselor who worked with A.G. and J.M. for nine months, testified that she worked with them on anger management, parenting skills, and couples counseling and that she "saw tremendous progress. I saw progress from youthful rebellious attitude

17

to more mature ways of dealing with the public." Jaquith was impressed with J.M.'s and A.G.'s medical knowledge about T.M.'s condition and said they discussed the children's needs and how the parents could better help them. She said A.G. and J.M. were "very engaged, very cooperative, very reliable to show up. They did everything I asked them to do." A.G. and J.M. checked in frequently and would describe for her times that they got upset about something, how they handled being upset, ways to improve their coping, and ways in which they had improved their anger-management skills. Jaquith believed that the parents' main problem was not that they were abusive or neglectful but that they had an "attitude problem" and did not care about how they were perceived, "which they're paying a high price for right now." Asked whether the children should be returned to A.G. and J.M., Jaquith answered, "I think they definitely should. . . . Because they're caring parents; they're very knowledgeable in child care practices; they love their children. And it's my opinion that they're not abusive."

## Standard of Review

To justify termination, the Department must prove both that the parent engaged in conduct enumerated as grounds for termination and that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *Williams v. Williams*, 150 S.W.3d 436, 449 (Tex. App.—Austin 2004, pet. denied). Because the termination of a parent's rights to his children is a drastic remedy of great weight and gravity, the Department must justify termination under the heightened standard of proof of "clear and convincing evidence." *See* Tex. Fam. Code Ann. § 161.001; *Williams*, 150 S.W.3d at 448-49. "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind

18

of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008); *see C.H.*, 89 S.W.3d at 25; *Williams*, 150 S.W.3d at 449. In our review, we "must maintain the respective constitutional roles of juries and appellate courts" and retain appropriate deference to the fact-finder's decisions. *C.H.,* 89 S.W.3d at 26. Thus, our review "must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *Id.*

In considering the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the fact-finder's determination, assuming that the fact-finder resolved disputed facts in favor of its finding if it would be reasonable to do so and asking whether the fact-finder could reasonably have formed a firm belief or conviction that the grounds for termination were proven. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *Williams*, 150 S.W.3d at 449. We disregard evidence that a reasonable fact-finder could have disbelieved but need not disregard all evidence contrary to the findings. *J.F.C.*, 96 S.W.3d at 266; *Williams*, 150 S.W.3d at 449. Instead, we consider the undisputed evidence, including evidence that does not support the findings, and only if we determine that no reasonable fact-finder could have formed a firm belief or conviction that the Department's allegations were true will we conclude that the evidence is legally insufficient. *J.F.C.*, 96 S.W.3d at 266; *Williams*, 150 S.W.3d at 449.

If the evidence is legally sufficient, we turn to factual sufficiency, viewing all of the evidence in a neutral light to determine whether the fact-finder could have reasonably formed a firm belief or conviction about the truth of the Department's allegations. *See J.F.C.*, 96 S.W.3d at 266. Evidence is factually insufficient only if "a reasonable factfinder could not have resolved [the]

19

disputed evidence in favor of its finding" and if "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *J.F.C.*, 96 S.W.3d at 266. Issues related to witness credibility, meaning questions that turn on a witness's appearance or demeanor, are left to the factfinder's determination as long as its determination is reasonable. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

## Termination Findings

We first address the contention made by both parents that the evidence was insufficient to support the jury's findings that A.G. and J.M. knowingly placed or allowed the children to remain in conditions that endangered their well-being or engaged in conduct or knowingly placed the children with someone who engaged in conduct that endangered their well-being, as well as J.M.'s arguments that the evidence is insufficient to show that he acted "knowingly," as required by the family code, or that the Department, not J.M. and A.G., should be appointed managing conservator of the children.

The parents place great emphasis on inconsistencies in Tolleson's testimony and on inconsistencies between her testimony and that of other witnesses, such as Olivo-Mendoza. They further point to statements made by some of the Department's witnesses about the cleanliness of the home, asserting that the overall testimony was that the house was not so unclean as to be a danger to the children. The parents note that Tolleson and Hodo were not present when T.M. was injured and admitted that they did not know that T.M.'s injuries were due to abuse and that Tolleson characterized J.M.'s behavior as trying to "aggravate, just to agitate." They further point to Jaquith's

20

testimony that A.G. and J.M. were cooperative and honest in their therapy work and that she did not believe they were abusive or incompetent parents. Finally, the parents contend that McWithey's testimony that, despite the parents' efforts to comply with the Department's requirements, something "just didn't feel . . . right" showed her "unchecked hubris" and that her opinion should be disregarded. They contend, no rational fact-finder could have formed a firm conviction that their actions were grounds for termination.

It is true that there were inconsistencies between Tolleson's testimony and her earlier statements to the Department, and it is true that Hodo and Tolleson both at times backtracked in their testimony to some degree. However, issues of credibility are left solely for the jury to evaluate, and we will not second-guess those decisions. *See J.P.B.*, 180 S.W.3d at 573.

Several witnesses testified that the house was filthy and unsanitary enough to be a risk to the children, particularly when one of them has serious medical conditions requiring sterilized equipment. There was testimony that the parents' explanation for T.M.'s more serious injuries, all of which occurred while he was in J.M.'s care, were inconsistent with the nurses' observations of T.M.'s usual behavior and changed over time. After one of his injuries, T.M. seemed to fear J.M. and would seek safety with a nurse when J.M. entered the room. A.M. was seen with a black eye on more than one occasion, as well as red marks that appeared to have been inflicted with medical tubing, and, again, the nurses testified that the parents' explanations for those injuries were suspicious. Several witnesses testified that A.M. acted as if she were frightened of her parents, dropping to the ground or begging not to be hit. Tolleson testified that J.M. frequently inflicted minor "aggravation" or "torture" on the children, picking them up by their feet, pushing or kicking them with his feet,

21

throwing toys at them, yelling at or insulting them, or squeezing, hitting, or spanking them. And, although A.G. was pregnant through many of the nurses' interactions with the family, which could explain some of her inactivity and distance from the children, several witnesses testified that she was detached and cool toward the children, did not interact with them, did not assist with cleaning the house, and never intervened on the children's behalf if J.M. was being abusive or cruel. Several witnesses, including J.M. himself, testified that he had anger-management problems, and, although Jaquith believed he had made significant progress with those issues, McWithey said that something about J.M. did not feel right, and Olivo-Mendoza believed Jaquith's relationship with A.G. and J.M. had gone beyond the bounds of a professional therapist-client relationship. The parents, particularly J.M., seem to have difficulty getting along with people to such an extent that they fired many of their nurses in a two-year period and argued with medical professionals at one of the area hospitals. Hodo testified that she once heard the parents speaking to doctors on the phone and that they downplayed T.M.'s medical situation, giving inaccurate and incomplete information; she believed the doctors would have recommended emergency care had they been given a full account of T.M.'s circumstances. Finally, there was testimony that J.M. drank alcohol on a daily basis while parenting his young children, that he had a "really high tolerance" for it, that he drank to the point that he "passed out on the floor" several times during Tolleson's time with the family, and that he continued to use marihuana after completing a rehabilitation program several years ago.

We recognize that the parents largely complied with Department requirements following the removal of the children. We also recognize that there were contradictions in some of the testimony supporting termination and that Jaquith testified that she believed the children should

22

be returned to the parents' care. However, based on the entire record, leaving credibility decisions to the jury as we must, *see id*, we cannot hold that no rational fact-finder could have formed a firm belief that both A.G. and J.M. engaged in conduct or left the children in the care of someone who engaged in conduct or placed the children or allowed them to remain in conditions that endangered their well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). We overrule A.G.'s sole issue on appeal and overrule J.M.'s first issue.

J.M. also argues that the evidence is insufficient to show that he acted knowingly, but the evidence does not support his contention. J.M. notes that there was little explicit attention paid at trial to his state of mind, that there were virtually no references to whether he acted intentionally with respect to the children's injuries, and that he was not challenged when he denied that he injured the children "on purpose." However, the kind of conduct described by the witnesses—constantly "aggravating" or "tortur[ing]" the children, throwing toys at them, pushing them, shoving them with his feet, picking them up by their feet, spanking, yelling at A.M., insulting T.M. or calling him names, or tickling or roughhousing until A.M. cried—is intentional and deliberate, not accidental, conduct. If J.M.'s assertion is that he did not know that such intentional conduct was harmful to the children, such an assertion would only bolster the Department's allegation that J.M. lacks competent parenting skills. Further, the fact that J.M. and A.G. gave inconsistent or evolving explanations for the children's injuries supports a conclusion that J.M. knew that his conduct was inappropriate or dangerous. The Department was not required to introduce testimony or evidence explicitly stating that J.M. knew he was endangering the children. Instead, the jury was entitled to draw that conclusion

23

from the evidence presented and, as we have explained, the evidence supports such a determination. We overrule J.M.'s third issue.

## Conservatorship Determination

In his fourth issue, J.M. contends that the evidence is insufficient to show that the Department should be appointed managing conservator of the children, asserting that the record is "devoid" of a discussion about the Department's conservatorship of the children. He argues that a rational juror could not have concluded that the Department should be appointed managing conservator instead of the parents, who have a presumptive advantage over the Department.[1] *See In re Mata*, 212 S.W.3d 597, 605 (Tex. App.—Austin 2006, orig. proceeding) ("There remains a strong presumption that the parent should be named temporary managing conservator.").

Because this is a case in which both parents' rights were terminated, J.M.'s challenge to the Department's conservatorship was subsumed into his appeal of the overall termination order. *See In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008); *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Therefore, because we have affirmed the termination decree, we affirm the trial court's appointment of the Department as managing conservator.[2] *See*

---

[1] J.M. does not contend that someone else other than he or A.G. should have been appointed managing conservator.

[2] The jury charge asked whether A.G., J.M., or the Department should be appointed managing conservator, explaining that if the jury answered that a parent's rights should be terminated, that parent should be disregarded as a possibility. The jury's decision that both parents should have their rights terminated left only the Department as a possible answer. Although there was little attention paid at trial to the specific question of conservatorship, the evidence supports the Department's appointment: the Department placed the children in loving foster homes where they are flourishing and receiving appropriate care; the Department ensured that the children are receiving services to help with their developmental delays and medical problems; and there was no evidence that any other person or agency would be a more suitable conservator.

24

*D.N.C.*, 252 S.W.3d at 319; *A.S.*, 261 S.W.3d at 92-93; *see also Melton v. Texas Dep't of Family & Protective Servs.*, No. 03-08-00168-CV, 2010 Tex. App. LEXIS 1352, at *34 (Tex. App.—Austin Feb. 25, 2010, no pet.) (mem. op.) (challenge to Department's conservatorship failed because challenge to termination decree failed). We overrule J.M.'s fourth issue.

## Best Interest Findings

Finally, we consider J.M.'s second issue, that the evidence is insufficient to show that termination was in the children's best interest.

In reviewing a best-interest determination, we consider: the children's wishes, their emotional and physical needs now and in the future, emotional or physical danger posed to the children now and in the future, the parenting skills of those seeking custody, programs available to assist those seeking custody to promote the children's best interests, plans for the children's futures, the stability of the home, any conduct by the parent that might show that the existing parent-child relationship is improper or harmful, and any excuse for that conduct. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The *Holley* factors are not exhaustive, nor must all factors be proved for us to affirm a verdict in favor of termination. *C.H.*, 89 S.W.3d at 27. As the *C.H.* court explained:

> The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest . . . . Other cases, however, will present more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice to uphold the jury's finding that termination is required.

*Id.*

25

J.M. notes that the record lacks significant explicit mention of the term "best interest" and argues there was no "real testimony actually touching upon" the children's best interest. He asserts that the Department can only point to McWithey's testimony that she believed J.M.'s and A.G.'s parental rights should be terminated, saw a lack of supervision at some visitations, and heard the parents have inappropriately adult conversations with the children. However, two witnesses testified that A.M. and T.M. appeared to fear their parents, and there was testimony, summarized earlier in this opinion, of the parents' abuse, petty torments, lack of engagement, and general poor parenting abilities. There was also testimony about how A.M. seemed to have improved—that her acting-out and apparent distress before and after visitations had abated, that her reading ability had increased, that she was doing better through therapy, and that her general well-being improved the longer she was in her foster home. A.M. and H.M.'s foster parents intended to adopt the girls if the parents' rights were terminated. Although there was little testimony about T.M.'s foster home, there was extensive testimony about his mistreatment at the hands of J.M., A.G.'s neglect of or inattentiveness toward him, and how he started to flourish when he went to school, as well as brief testimony indicating that the Department planned to have T.M.'s foster mother, a nurse, adopt him if J.M.'s and A.G.'s rights were terminated. On this record, we cannot hold that the evidence is insufficient to support the jury's determination that termination of J.M.'s and A.G.'s rights was in the children's best interest. We overrule J.M.'s second issue on appeal.

## Conclusion

After a careful review of the record and governing law, we have overruled A.G.'s and J.M.'s issues on appeal. We affirm the trial court's termination order.

26

_____

David Puryear, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed on Rehearing

Filed:   June 11, 2013